UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse 40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

## MOTION INFORMATION STATEMENT

**Docket Number(s):** 24-237 Kirk v Citigroup Global Markets Holdings Inc.
Caption [use short title]

**Motion for:** Recall of Mandate

Set forth below precise, complete statement of relief sought:

Recall the mandate in No. 24-237 and reconsider the March 10, 2025 judgment in light of the Pricing Supplement quotation, the Closing Indicative Value allegations, and the alleged daily tracking discrepancy; vacate or modify the judgment as warranted.

**MOVING PARTY:** David M. Kirk, pro se **OPPOSING PARTY:** Citigroup Global Markets Holdings Inc.

- [x] Plaintiff
- [ ] Defendant
- [x] Appellant/Petitioner
- [ ] Appellee/Respondent

**MOVING ATTORNEY:** David M. Kirk, pro se **OPPOSING ATTORNEY:** Samuel J. Rubin, Goodwin Procter LLP

[name of attorney, with firm, address, phone number and e-mail]

| Moving Attorney | Opposing Attorney |
|---|---|
| 873 Southern Creek Drive | NY Times Building, 620 Eighth Avenue |
| St Johns, FL 32259 | New York, NY 10018 |
| (904) 806-6937 mycommunityaddress@yahoo.com | (212) 813-8800 srubin@goodwinlaw.com |

Court- Judge/ Agency appealed from: S.D.N.Y. - Judge Andrew L. Carter, Jr.

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
- [x] Yes
- [ ] No (explain):

Opposing counsel's position on motion:
- [ ] Unopposed
- [ ] Opposed
- [x] Don't Know

Does opposing counsel intend to file a response:
- [ ] Yes
- [ ] No
- [x] Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:**

Has this request for relief been made below? [ ] Yes [ ] No

Has this relief been previously sought in this court? [ ] Yes [ ] No

Requested return date and explanation of emergency:

Is the oral argument on motion requested? [ ] Yes [x] No (requests for oral argument will not necessarily be granted)

Has the appeal argument date been set? [ ] Yes [x] No If yes, enter date:

**Signature of Moving Attorney:**

/s/ David M Kirk, pro se **Date:** 10/13/2026 Service : [✓] Electronic [✓] Other [Attach proof of service]

**Form T-1080** (rev. 10-23)

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

**DAVID M. KIRK,** **No. 24-237**
Plaintiff-Appellant,

v.

**CITIGROUP GLOBAL MARKETS HOLDINGS INC.,**
Defendant-Appellee.

## APPELLANT'S MOTION TO RECALL MANDATE

Plaintiff-Appellant David M. Kirk, proceeding pro se, respectfully moves this Court to recall its mandate in Appeal No. 24-237 and to reconsider the March 10, 2025 judgment affirming dismissal. Appellant recognizes that recall is an extraordinary remedy. This motion is not presented merely to repeat the rehearing petition. It presents the full extent and significance of a five-word phrase omitted from the Pricing Supplement language that the Summary Order quoted as part of its stated basis for affirmance.

### I. GOVERNING STANDARD

The Second Circuit has inherent power to recall a mandate, but exercises that power sparingly because of the need for finality. *Waldman v. Palestine Liberation Org.*, 171 F.4th 575, 591-92 (2d Cir. 2026); *Sargent v. Columbia Forest Prods., Inc.*, 75 F.3d 86, 89-90 (2d Cir. 1996); see also *Calderon v. Thompson*, 523 U.S. 538, 549-50 (1998). The Court's most recent precedential treatment explains that "[n]o formal test governs" the discretion, while identifying relevant considerations including whether the asserted circumstance seriously calls the judgment into question, preservation, lapse of time, and the equities. *Waldman*, 171 F.4th at 591-94. *Fine v. Bellefonte Underwriters Insurance Co.*, 758 F.2d 50, 53 (2d Cir. 1985), also underscores that recall is not a vehicle simply to re-present an argument already made and rejected. Appellant addresses that concern directly below.

### II. THE SUMMARY ORDER USED AN ABBREVIATED VERSION OF THE PRICING SUPPLEMENT AS A STATED BASIS FOR AFFIRMANCE

The Court reviewed the Rule 12(b)(6) dismissal de novo, accepting factual allegations as true, drawing reasonable inferences in Appellant's favor, and construing his pro se submissions liberally. Summary Order at 3 (Ex. A). As to Section 12(a)(2), the Court described the Fourth Amended Complaint as alleging that Citigroup misrepresented the ETNs' performance by stating that they were designed to track the S&P; GSCI Crude Oil Index at a "3x" rate while the trading price of the ETNs plummeted. The Court then reasoned that Citigroup had "clearly and repeatedly" stated that the ETNs' "indicative value," derived from the crude-oil index, could differ from secondary-market trading price. Summary Order at 4-5 (Ex. A).

The Summary Order quoted the Pricing Supplement as follows: **"[The] Indicative Value of the ETNs are not the same as the trading price of the ETNs"** and continued with the market-determined-price language. Summary Order at 5 (Ex. A). The original Pricing Supplement instead states: **"However, the Intraday Indicative Value and Closing Indicative Value of the ETNs are not the same as the trading price of the ETNs"** and continues by explaining the secondary-market trading price. Pricing Supplement, "Understanding the Value of the ETNs" (Ex.

B). Thus the Summary Order replaced the five-word phrase **"Intraday Indicative Value and Closing"** with **"[The]"**.

## III. THE OMITTED WORDS IDENTIFY DISTINCT VALUATION CONCEPTS IN THE PRICING SUPPLEMENT

The surrounding text shows why the complete terminology matters. The Pricing Supplement states that payments upon early redemption, Optional Acceleration, and maturity - expressly excluding the Automatic Acceleration Redemption Amount - are based on Closing Indicative Value on one or more Valuation Dates. It explains that Intraday Indicative Value indicates what Closing Indicative Value would be if the then-current intraday index level were the closing index level, and that Intraday Indicative Value is also used to determine the Automatic Acceleration Redemption Amount in the event of Automatic Acceleration. Ex. B.

The same section states that Citigroup arranged publication of the "Intraday Indicative Value and Closing Indicative Value (each, an 'Indicative Value')" before giving the market-price warning quoted by this Court. Ex. B. The next subsection states that Closing Indicative Value is "designed to reflect the end-of-day economic value" of the ETNs. The omitted terminology therefore was part of the Pricing Supplement's defined valuation structure, not surplus wording.

## IV. THE DISTINCTION WAS TIED TO AN ALLEGATION ACTUALLY PLEADED

This is not a valuation theory first created after judgment. Paragraph 7 of the Fourth Amended Complaint expressly quoted the Pricing Supplement: "The Closing Indicative Value of each series of ETNs on each Index Business Day is based on the closing level of the Index on that Index Business Day." Fourth Amended Complaint, Doc. 144 at 5 (Ex. C). The same paragraph alleged that on March 19, 2020 the referenced index rose 24.39%, while UWT's secondary-market closing price rose approximately 23%, and contrasted that result with the ETN's "3x" description. Ex. C. The preceding paragraph alleged the closing-price sequence from March 17 through March 19 and alleged that the discrepancy was not corrected.

Appellant does **not** contend that Closing Indicative Value and secondary-market closing price are necessarily identical; the Pricing Supplement says they may differ. The narrower point is that the operative complaint expressly invoked Closing Indicative Value and the index's closing level, while the Summary Order's quotation removed the language identifying both Closing Indicative Value and Intraday Indicative Value and presented a generalized "[The] Indicative Value" warning as a reason the pleading failed.

## V. THE PRIOR REHEARING PETITION IDENTIFIED ONLY PART OF THE QUOTATION PROBLEM

Appellant candidly acknowledges that his March 21, 2025 petition for panel rehearing challenged the quotation. It stated: "Critically omitted from this statement as cited below is the word Intraday." Petition for Rehearing at 3 (Ex. D). It then argued that Appellant's allegations concerned values at market closing, not merely temporary intraday variation.

That petition did not identify the significance of the complete five-word phrase "Intraday Indicative Value and Closing" or explain that the original sentence expressly names both valuation measures before the document defines each as an "Indicative Value." Appellant does not contend that the source document was newly discovered. Rather, what was not appreciated and presented in March 2025 was the significance of the full phrase and the way the abbreviation collapsed two separately identified valuation measures into a generalized phrase.

The circumstances of the rehearing filing are documented in the petition itself: Appellant stated that he learned of the March 10 decision only hours before composing the petition late at night and was "frantically composing" it under what he understood to be an impending deadline. Ex. D. During this same general period, Appellant was also pursuing separate litigation arising from the January 2025 termination of his principal source of earned income, which further contributed to the circumstances in which the rehearing petition was prepared and his subsequent ability to revisit this record. Appellant does not rely on that separate litigation as evidence concerning Citigroup or this appeal; it is mentioned only as chronology.

### VI. TIMING AND THE SUBSEQUENT RECOGNITION OF THE FULL ISSUE

Appellant recognizes that approximately eighteen months have elapsed since rehearing was denied. The present motion does not attempt to disguise that lapse. His more recent recognition of the significance of the complete omitted phrase arose during renewed review of the record in connection with related post-judgment proceedings beginning in 2026. That review included the April 2026 filing of a separate action concerning the service-of-process issue that preceded the New York litigation, as well as later post-judgment and oversight work. During that renewed examination, Appellant recognized that the issue he had identified hurriedly in March 2025 was broader than omission of the single word "Intraday."

The timing weighs against recall and is a matter for the Court to consider under *Waldman* and *Sargent*. But the objective nature of the discrepancy, its connection to a theory actually pleaded, and the narrow relief requested weigh in the other direction. Unlike a request to relitigate the entire appeal, this motion asks the Court to compare its quotation with the underlying document and reconsider the portion of its reasoning that relied on that quotation.

### VII. WHY THE DISCREPANCY MATTERS AT THE PLEADING STAGE

The Court's Section 12(a)(2) analysis concluded that Citigroup had "clearly warned investors about the risks associated with the ETNs" and cited *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 338 (2d Cir. 2011), for dismissal where the defendant had explicitly disclosed the very risks about which the plaintiff claimed to have been misled. Summary Order at 5 (Ex. A). The Pricing Supplement quotation was therefore part of the Court's stated reason for finding the pleaded misrepresentation insufficient as a matter of law.

Restoring the omitted words does not itself establish Citigroup's liability, and Appellant does not ask the Court to decide liability on this motion. It does reveal that the cited disclosure expressly referred to two differentiated valuation measures - one of which, Closing Indicative Value, was specifically invoked in the operative complaint. At the Rule 12(b)(6) stage, where Appellant's factual allegations were to be accepted as true and his pro se submissions construed to raise their strongest arguments, Appellant respectfully submits that the distinction warrants reconsideration under the actual language of the Pricing Supplement.

### VIII. THE REQUEST IS NARROW

Appellant does not ask the Court to adjudicate every factual dispute, determine ultimate securities liability, or revisit every ruling made during the litigation. The requested inquiry can be resolved principally from the Court's Summary Order, the Pricing Supplement, the operative Fourth Amended Complaint, and the prior rehearing papers. Those documents show the language the Court quoted, the language Citigroup actually wrote, the Closing Indicative Value allegation actually pleaded, and the narrower omission issue Appellant previously raised.

## SUPPLEMENT TO SECTION VII: THE ALLEGED TRACKING DISCREPANCY

Appellant further submits that the Summary Order's reference to UWT's trading price declining during the COVID-19 pandemic did not fully address the specific daily tracking discrepancy alleged in the Fourth Amended Complaint. The allegation was not merely that oil prices declined or that the ETNs incurred losses from ordinary market movements. Rather, paragraph 7 of the Fourth Amended Complaint alleged that on March 19, 2020, the underlying index increased 24.39%, whereas UWT's secondary-market closing price increased approximately 23%, compared with 73.17% from multiplying the index's percentage change by three. The difference is approximately 50.17 percentage points. See Ex. C (Fourth Amended Complaint, Doc. 144 ¶ 7).

Appellant also asserts, based on his historical calculations, that the daily relationship had previously exhibited an average tracking error of approximately 0.003% over approximately 850 trading days. These historical figures are Appellant's calculations, not independently established by the exhibits submitted with this motion. They are offered to identify the claimed magnitude and abruptness of the departure, not as conclusive proof of intentional misconduct. The Court should distinguish a percentage-point difference in daily returns from a percentage error calculated using a specified methodology.

Appellant acknowledges that the Pricing Supplement expressly distinguishes the ETNs' market-determined secondary-market trading price from both Closing Indicative Value and Intraday Indicative Value. The existence of that disclosure is not disputed. Appellant's narrower contention is that the Court should consider whether the particular factual allegations, including the magnitude and timing of the alleged deviation and the Closing Indicative Value allegations actually pleaded, were adequately addressed in determining whether the statements challenged under Section 12(a)(2) were materially misleading. Appellant recognizes that a price deviation alone does not establish that Citigroup made a false representation or caused the deviation.

**CONCLUSION**

For the foregoing reasons, Plaintiff-Appellant David M. Kirk respectfully requests that the Court recall its mandate in Appeal No. 24-237; reconsider the March 10, 2025 judgment to the extent it relied upon the materially abbreviated Pricing Supplement quotation described above; vacate or modify the judgment as necessary to permit reconsideration under the actual Pricing Supplement language; and grant such other relief as the Court deems just and appropriate.

Dated: October 13, 2026

Respectfully submitted,

/s/ David M. Kirk
David M. Kirk
Plaintiff-Appellant, Pro Se
873 Southern Creek Drive
Saint Johns, FL 32259
(904) 806-6937
mycommunityaddress@yahoo.com

**CERTIFICATE OF COMPLIANCE**

I certify that this motion complies with the applicable type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2). The motion memorandum contains fewer than 5,200 words, excluding material excluded from the count by the Rules.

/s/ David M. Kirk

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

**David M. Kirk v. Citigroup Global Markets Holdings Inc.**
Case No. 24-237

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2026, I served a true and correct copy of the Motion to Recall Mandate, together with its accompanying documents and exhibits, upon counsel for Defendant-Appellee by electronic mail, pursuant to counsel's prior written consent, and by first-class United States Mail, postage prepaid, addressed as follows:

**Samuel J. Rubin**
Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
srubin@goodwinlaw.com

Dated: October 13, 2026

/s/ David M. Kirk
David M. Kirk
Plaintiff-Appellant, Pro Se

# EXHIBIT A

Second Circuit Summary Order, March 10, 2025 (No. 24-237)

24-237
*Kirk v. Citigroup Glob. Mkts. Holdings Inc.*

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

**SUMMARY ORDER**

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 10th day of March, two thousand twenty-five.

PRESENT:

RICHARD J. SULLIVAN,
EUNICE C. LEE,
*Circuit Judges*,
CHRISTINA C. REISS,*
*Judge*.

---

DAVID M. KIRK,

*Plaintiff-Appellant*,

v. No. 24-237

---

* Chief Judge Christina C. Reiss, of the United States District Court for the District of Vermont, sitting by designation.

CITIGROUP GLOBAL MARKETS HOLDINGS INC.,

*Defendant-Appellee*.

---

**For Plaintiff-Appellant:** David M. Kirk, *pro se*, Saint Johns, FL.

**For Defendant-Appellee:** Samuel J. Rubin, Goodwin Procter LLP, New York, NY; William E. Evans, Goodwin Procter LLP, Boston, MA; Brian T. Burgess, Goodwin Procter LLP, Washington, DC.

Appeal from a judgment of the United States District Court for the Southern District of New York (Andrew L. Carter, Jr., *Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the December 28, 2023 judgment of the district court is **AFFIRMED**.

David Kirk, a Florida broker proceeding *pro se*, appeals from a judgment of the district court dismissing his claims, with prejudice, against Citigroup Global Markets Holdings Inc. ("Citigroup") for violations of federal securities laws and state common-law fraud. We assume the parties' familiarity with the facts,

Case: 24-237, 10/13/2026, DktEntry: 43.1, (11 of 29)

procedural history, and issues on appeal.[1]

We review a district court's dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) *de novo*, "accepting all factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor." *Bangs v. Smith*, 84 F.4th 87, 95 (2d Cir. 2023) (internal quotation marks omitted). To survive a Rule 12(b)(6) motion to dismiss, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Where, as here, the complaint alleges claims sounding in fraud, a plaintiff must further "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Because Kirk is proceeding *pro se*, we construe his submissions "liberally" and interpret them "to raise the strongest arguments that they suggest." *Meadows v. United Servs., Inc.*, 963 F.3d 240, 243 (2d Cir. 2020) (internal quotation marks omitted).

## I. Section 12 of the Securities Act of 1933

Kirk, who purchased exchange traded notes ("ETNs") issued by Citigroup,

[1] Although the district court did not enter judgment on a separate document as required by Federal Rule of Civil Procedure 58(a), the judgment became final 150 days after the order was entered on the docket, *see* Fed. R. Civ. P. 58(c)(2)(B), and we deem Kirk's notice of appeal to have been timely filed as of that date, *see* Fed. R. App. P. 4(a)(2); *see also* Fed. R. App. P. 4(a)(7)(B) ("A failure to set forth a judgment or order on a separate document when required by [Rule] 58(a) does not affect the validity of an appeal from that judgment or order.").

first challenges the dismissal of his claim for securities fraud in violation of section 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(a)(2).[2] To state a claim under section 12(a)(2), a plaintiff must allege, at the very least, that the defendant made "an untrue statement of a material fact or omit[ted] . . . a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) (internal quotation marks omitted).

We agree with the district court that Kirk has failed to allege that Citigroup made a materially false statement. In his fourth amended complaint ("FAC"), Kirk alleges that Citigroup misrepresented the performance of its ETNs by stating in its Pricing Supplement that they were designed to track the S&P GSCI Crude Oil Index at a "3x" rate, when in reality, the trading price of the ETNs Kirk held plummeted during the COVID-19 pandemic. But Citigroup clearly and repeatedly stated that the "indicative value" of the ETNs, which was derived from

[2] We previously vacated the district court's dismissal of Kirk's then-operative complaint, holding that the complaint's allegations could be construed to implicate both section 11 and section 12 of the Securities Act of 1933. *See Kirk v. Citigroup Glob. Mkts. Holdings Inc.*, No. 22-179, 2022 WL 10218518, at *2 (2d Cir. Oct. 18, 2022). Because the challenged statements are contained in a Pricing Supplement, and not a registration statement, we apply section 12 rather than section 11, though the statutes are the same in all material respects. *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).

Case: 24-237, 10/13/2026, DktEntry: 43.1, (13 of 29)

the crude-oil index, could differ from the ETNs' trading price in secondary markets. *See* Suppl. App'x at 17 ("[The] Indicative Value of the ETNs are not the same as the trading price of the ETNs, which is . . . a market-determined price that will reflect market supply and demand."). The Pricing Supplement further described how trading prices could be affected by "many unpredictable factors" that alter "global supply and demand for crude oil." *Id.* at 41. Accordingly, because the Pricing Supplement clearly warned investors about the risks associated with the ETNs, and because Kirk has not alleged any other facts that would render the statements made regarding the ETNs false, Kirk has failed to state a claim under section 12(a)(2). *See Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 338 (2d Cir. 2011) (affirming the dismissal of a securities fraud claim when the defendant had "explicitly disclosed the very . . . risks about which [the plaintiff] claim[s] to have been misled").

**II. Section 10(b) of the Exchange Act of 1934 and Common-Law Fraud**

Kirk also challenges the district court's conclusion that he failed to plausibly allege a claim under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and for common-law fraud under New York law. To state a claim under section 10(b), a plaintiff must plead "that the defendant made a false statement or

omitted a material fact." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (internal quotation marks omitted). Similarly, to state a claim for common-law fraud under New York law, a plaintiff must allege that "the defendant made a material false representation." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 186–87 (2d Cir. 2004). Given that Kirk's section 10(b) and common-law fraud claims rely on the same allegations of falsity as his section 12(a)(2) claim, we agree with the district court that Kirk failed to state a claim that Citigroup made a material misrepresentation concerning the performance of the ETNs.[3]

---

[3] The district court only reached the merits of Kirk's common-law fraud claim in the alternative, having initially concluded that it lacked subject-matter jurisdiction over that claim because Kirk had not alleged an amount in controversy exceeding $75,000. *See* 28 U.S.C. § 1332. But Kirk requested more than $75,000 when accounting for punitive damages, which "may be included in determining whether the jurisdictional amount is satisfied" where "punitive damages are permitted under the controlling law." *See A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 87 (2d Cir. 1991); *see also Walker v. Sheldon*, 10 N.Y.2d 401, 405 (1961) (allowing punitive damages for fraud claims where "the fraud, *aimed at the public generally*, is gross and involves high moral culpability" (emphasis added)). We therefore cannot say that it is a "legal certainty" that Kirk's alleged amount recoverable does not meet the jurisdictional threshold. *See Wolde-Meskel v. Vocational Instruction Project Cmty. Servs., Inc.*, 166 F.3d 59, 63 (2d Cir. 1999). In any event, because Kirk's common-law fraud claim is premised on the same alleged misstatements as his federal claims, the district court clearly had supplemental jurisdiction over that claim pursuant to 28 U.S.C. § 1367(a).

## III. Recusal

Finally, we reject Kirk's challenge to the district court's denial of his recusal motions. *See United States v. Lovaglia*, 954 F.2d 811, 815 (2d Cir. 1992) (reviewing the denial of a recusal motion for abuse of discretion). To begin, because we have confirmed on *de novo* review that the district court correctly dismissed Kirk's FAC, his challenge to the court's recusal rulings is effectively moot. *See Faulkner v. Nat'l Geographic Enters. Inc.*, 409 F.3d 26, 42 n.10 (2d Cir. 2005); *see also Camacho v. Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482, 490 (1st Cir. 1989) (concluding that the judge's refusal to recuse was at most harmless error, and the "matter of disqualification [was] moot," where the circuit court "independently confirmed the correctness of the lower court's decision"). In any event, we are confident that Kirk's asserted bases for recusal – the district court's prior rulings against him, purported delays in the disposition of this case, and speculative conflicts of interest – would not have caused "an objective, disinterested observer fully informed of the underlying facts" to "entertain significant doubt that justice would be done absent recusal." *United States v. Amico*, 486 F.3d 764, 775 (2d Cir. 2007) (internal quotation marks omitted); *see, e.g.*, *Liteky v. United States*, 510 U.S. 540, 555 (1994) ("[J]udicial rulings alone almost never constitute a valid basis for a bias or

partiality [recusal] motion."); *United States v. Thompson*, 76 F.3d 442, 451 (2d Cir. 1996) ("Disqualification is not required on the basis of remote, contingent, indirect or speculative interests." (internal quotation marks omitted)). In affirming the district court's recusal decisions, we commend Judge Carter for maintaining his decorum. Self-represented status does not relieve parties of the expectation that they will comport themselves civilly when addressing opposing counsel and the court.

* * *

We have considered Kirk's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court dismissing all of Kirk's claims with prejudice.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

# EXHIBIT B

Pricing Supplement - “Understanding the Value of the ETNs”

# EXHIBIT C

Fourth Amended Complaint, Document 144, relevant pages 4-6

Case 24-237, 10/13/2026, DktEntry: 43.1, Page 20 of 29

***bold*** throughout complaint the most 'egregious', 'gross' and 'morally reprehensible' reasons justifying punitive damages. By the daily (and real time) % changes in the stocks issued by defendant (uwt and its advertised inverse stock dwt) faithfully mirroring each other and faithfully tracking the index they were advertised to track for months, investor stockholders (aka "public at large") such as plaintiff built reliable trust in both stocks performing as advertised. However as detailed in paragraphs 4-8 below, in a two day period both stocks under tracked the index they were advertised to track by over 50%, and in paragraph 7 that uwt had a massive 50 percentage point shortfall in tracking the index as advertised causing nearly an 80% loss to many uwt stockholders (including plaintiff for the majority of his shares sold on March 19, 2020 – for 31,000 of the shares sold)4 because the fraudulent tracking was timed when the price of oil was at a historic low. Paragraph 9 details that ***the timing of the fraud coincided exactly TO THE DAY of the NY Governor's order starting the reduction of personnel of non-essential businesses of 50% on March 18 increasing to 100% on March 20, preventing all victims from filing in their home states for all states except NY. In two days a 50%-80% loss for victims plus being forced to file in the venue of the plaintiff. As detailed at the end of footnote 4, victims having bought and held uwt only 13 days (or more for many cases) prior to March 19 would have suffered losses of 94%.***[4]

## Complaint

3) Statement of Claim: Plaintiff claims he suffered damages listed below as a result of defendant's blatant fraud in its stock uwt grossly not tracking the index it was advertised to track (i.e., false advertising). Plaintiff has submitted Doc 13-1 which establishes plaintiff as the Grantor and Trustee and until death the person solely authorized to make all actions by and for said Trust in which the account (Doc 1-2) which suffered the losses is in entitled under.

4) Defendant (abbrev. CGMHI) was the issuer of the two now liquidated & defunct stocks as shown in Doc 1-1 symbol UWT advertised by defendant as **Velocity Shares 3x Long Crude Oil ETNs linked to the S&P GSCI Crude Oil Index ER New** and symbol DWT advertised as **Velocity Shares 3x Inverse Crude Oil ETNs linked to the S&P GSCI Crude Oil Index ER New**. As the two

stocks are advertised as the inverse of each other, by definition the % one increased each day would be almost exactly the % the other decreased the same day, which is exactly what happened every day for months. However, Doc 1-1 shows that from the closing price of 0.6410 on March 17, 2020, uwt dropped to 0.3160 as the closing price two days later on March 19, 2020 – a decrease of 50.7%. Doc 1-1 shows next that in that same two-day period, dwt dropped in price from a closing price of 22.10 on March 17 to 10.15 at closing on March 19 – a drop of 54.1%. ***Both stocks dropped over 50% in the same two-day period – clearly blatant acute false advertising by defendant – clearly not following each other as inverse stocks following the stated index or any index. In those two days, defendant stole over half of all investor's money in BOTH stocks***.

5) The third pic in Doc 1-1 shows a screenshot of all the transactions made by the plaintiff for only the stock uwt, omitting transactions in other stocks not related to this case for simplification. Doc 1-2 is plaintiff's official March 2020 brokerage statement for confirming all the transactions in the simplified Doc 1-1 third pic. Plaintiff suffered total losses from uwt as shown in the final pic of Doc 1-1 as $43,300 from the illegal tracking shortfall.

6) The time period of two days was chosen by plaintiff because it most clearly shows the gross fraudulent index mis tracking since in that period both uwt and the advertised inverse dwt dropped over 50%. To break down the results for each of the two days, referring to the first pic in Doc 1-1, on March 18, 2020, uwt dropped from .6410 (closing price on March 17) to a closing price on March 18 of .2570 - a 59.9% drop. In the same time period, from the second pic, dwt increased from 22.10 to 28.01 - only a 26.7% increase - far short of the 59.9% it should have increase to mirror the drop in uwt since dwt was advertised as the inverse stock. On March 19, uwt rose from .2570 (closing price on March 18) to a closing price on March 19 of .3160 - a 23% increase. In the same time period, dwt dropped from 28.01 to 10.15 - a massive 68.3% drop, far exceeding the 23% increase in uwt. On both days, the stock which dropped did so far more than its inverse stock rose, causing a net result of an over 50% drop in both stocks over the two-day period. Thus, on the second day the first day's discrepancy was not corrected but further exacerbated greatly.

7) Though the fact that the stocks advertised as inverse of each other grossly did not mirror each other for March 18 & 19, 2020, plaintiff further provides evidence showing the direct miscorrelation between uwt he bought and the index it was advertised to track. Page 8 of the prospectus states "The Closing Indicative Value of each series of ETNs on each Index Business Day is based on the closing level of the Index on that Index Business Day." Doc 13-2 shows that on March 19, the index rose 24.39%. As mentioned in paragraph 4 above, per first pic in Doc 1- 1, uwt is advertised in its symbol description as **"Velocity Shares 3x Long Crude Oil ETNs linked to the S&P GSCI Crude Oil Index ER New"**. So **"3x"** would mean that uwt should have rose 24.39% times 3 equaling 73.17%. But as mentioned in the prior paragraph, on March 19 **(***ONE SINGLE DAY, NOT MORE – I DON'T KNOW WHY THIS ISSUE KEEPS COMING UP**) uwt only increased 23% - a massive shortfall never corrected for. **If "supply and demand" can account for a 50% discrepancy in index tracking advertised in the stock symbol description, then the description itself is fraudulent. Nobody can conclude that the "supply and demand" effect on causing fluctuation in price from the targeted advertised tracking price could mean anything but miniscule variation which is exactly how the stock tracked until the day of the fraud and my repeated stating of such faithful tracking has never been contested.** And if the 1 in 850 days occurring on the day of closure isn't convincing enough of fraud intent, my Doc 47 introduces new evidence of four additional days of fraud shortly after. In Doc 64 I show the calculation that if one were to assume that all 5 days were accidental, the odds that all resulted in the gross benefit of the Defendant combined with the 1 in 850 figure above come to odds of 1 in 522 trillion. Could any fraud be so obvious? The four additional days of fraud quell the Doc 123 statement "an isolated transaction incident" in its entirety. Even putting aside the four additional days, the amount of mis tracking of 50% is key. Why even put in the stock description that the stock will track the specified index if it can be off by 50%? I wish now address page 5 of Doc 123 because that is the crux of Defense Counsel's argument which they will surely present again so I wish to quell completely in short order in advance. Page 5 states "the Pricing Supplement explained that the trading price of the UWT ETNs is determined based on trading in the secondary market".

a) First, the stock description in bold stating tracking of the stated index is surely more relevant than and supersedes anything stated otherwise in the prospectus. Every buyer of the stock sees the stock description. Very few if

# EXHIBIT D

Petition for Panel Rehearing, March 21, 2025, relevant pages

**24-237**

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

______________________________________________

DAVID M. KIRK, Plaintiff-Appellant
V.
CITIGROUP GLOBAL MARKETS HOLDINGS, INC. Defendant-Appellee

______________________________________________

On Appeal from the United States District Court
for the Southern District of New York

______________________________________________

Petition for Rehearing

By Appellant David M. Kirk, Pro Se
873 Southern Creek Drive
Saint Johns, FL 32259
(904) 806-6937
mycommunityaddress@yahoo.com

## TABLE OF CONTENTS

Page(s)

Table of Contents……………………………………………………………….2
Argument…………………………………………………………………………3-5
Certificate of Compliance……………………………………………………6
Certificate of Service……………………………………………………….7

# ARGUMENT

First and foremost, please be advised that I am frantically composing this petition in the very late-night hours of Thursday, 3/20/25 as I was only made aware hours ago of the 3/10/25 dismissal by this Honorable Court from getting word from a friend as I've received no notice to date in the mail or by email. My new case manager told me hours ago that the 14-day deadline to file this is Monday, so I consider my deadline as shortly after 8am Friday (only hours from now), as that seems to be the best time for emailing filings for them to be docketed fastest just as the court opens. This would still leave Monday in case it isn't docketed Friday.

In the dismissal, this court cited on page 5 from the stock prospectus "[The] Indicative Value of the ETN's are not the same as the trading price of the ETNs, which is…a market-determined price that will reflect market supply and demand". Critically omitted from this statement as cited below is the word **Intraday**, as I quoted from the prospectus in paragraph 4 my brief "Doc 156 cites from the prospectus 'The actual trading price of the ETNs in the secondary market may vary significantly from their **Intraday** Indicative Value." My complaints (in paragraph 6 of Docs 21,22, and 144) have continuously stated a 50% shortfall in value from stock market closing on March 17, 2020 to closing on March 19, 2020 – value at 4pm **market Closing, not Intraday.** The use of "Intraday" in the prospectus would naturally cause readers to infer that such intraday variation would be corrected by 4pm market closing time.'" And my argument further expounded that not only was the stock 50% underpriced at 4pm closing, but this was never corrected for AND another four days of gross underpricing occurred in the brief two-week period between the announcement of stock liquidation and liquidation itself. AND that the inverse stock dwt which had faithfully inversely correlated to uwt stock for the 180 trading days since inception grossly didn't inversely correlate then nor in the four additional mentioned days. Obviously, the stock description in bold promising to follow 3X the change in the oil index and the history of doing so within an accuracy of 1% for the first 180 trading days in all the trading hours of all those days as well as the end of the day closing pricing trumps a 50% error in pricing never corrected for. The prospectus merely accounts for a variation in **Intraday** Indicative Value. This argument should be allowed to be presented to a fair-minded jury. As well as supporting arguments already presented that a computer program was almost certainly used to keep the stock at the price targeted for all those hours of open trading for 180 days consecutively, and if the

target price (of 3X the change in the oil index) got too high, Citi sold stock to bring the price down and vice versa is the price got too low. That is realistically the only way it could have tracked the price faithfully the first 180 days. Given the sudden 50% shortfall, the computer program must have drastically changed so Citi could reap the $154 million ill-gotten gain I mentioned. Citing this court's recent dismissal, page 5, that 'The Pricing Supplement further described how trading prices could be affected by "many unpredictable factors" that alter "global supply and demand for crude oil"'. The fluctuation in oil price has nothing to do with the stock tracking the price change in the specified oil index and I never stated that the change in the price of oil had any bearing on my case. Except that in addition to choosing the day they knew their main office would be closed and couldn't be served summons from courts in states other than New York, Defendant also benefited from timing the fraud when the price of oil was at a historic low to maximize their ill-gotten gain. That's likely why they chose to defraud the very day of then Gov Cuomo's order before the price of oil rebounded even at the risk of it making the timing of the fraud appear to so obviously border on criminal, knowing they couldn't be served summons from courts outside NY with their office closed. Regardless, the drop in oil price contributed in no way to the fraud and I never argued that it did. I only argued the gross fraud in the stock being allowed to drop 50% under the promised target price for the oil index it was promised to track. Paragraph one of my appeal "Statement of Case" calculated the odds of all these occurrences happening at random as **1 in 522 trillion**. Remember that all 5 days of fraud and the timing of the office closure were all to the ill-gotten benefit of Citi. Not a single occurrence was to their detriment.

Quoting from page 5, paragraph 2 of my appeal, "Also, Defense Doc 152 supporting Motion to Dismiss on page 7 states 'As recognized by several courts in this District (including this Court), the Pricing Supplement explains that the UWT ETNs' trading prices are "market determined" prices that can "vary significantly" from the indicative values of the UWT ETNs based on the Index and **used to value the notes at redemption or maturity**."' The 50% shortfall in value detailed in this brief and my Doc 144 complaint was never corrected for – in fact the four addition days of gross under tracking fraud after means the value of the notes at redemption was 94% less than the indicative value as I stated in Doc 144 page 4 (end of paragraph 2) with the calculation proof in footnote 4." How is a 94% shortfall at maturity justified by the sentence above ending in the bolded words?

Once again, I assert that the fluctuation in the "temporary" **Intraday** Indicative Value because of "supply and demand" which this court cites in the 3/10/25

# EXHIBIT E

Order Denying Panel Rehearing, April 2, 2025

**UNITED STATES COURT OF APPEALS**
**for the**
**SECOND CIRCUIT**

---

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 2nd day of April, two thousand twenty-five,

Present: Richard J. Sullivan,
Eunice C. Lee,
Circuit Judges,
Christina C. Reiss,*
Judge.

---

David M. Kirk,

Plaintiff - Appellant,

v.

Citigroup Global Markets Holdings Inc.,

Defendant - Appellee.

---

**ORDER**
Docket No. 24-237

Appellant David M. Kirk having filed a petition for panel rehearing and the panel that determined the appeal having considered the request,

IT IS HEREBY ORDERED that the petition is DENIED.

For The Court:
Catherine O'Hagan Wolfe,
Clerk of Court




---

* Chief Judge Christina C. Reiss, of the United States District Court for the District of Vermont, sitting by designation.